UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
C.H., individually and on behalf of F.H., a child
with a disability,

                                        Plaintiff,                          **OPINION AND ORDER**

                - against -                                                 No. 11-CV-6933 (CS)

GOSHEN CENTRAL SCHOOL DISTRICT,

                                        Defendant.
------------------------------------------------------------------------x

<u>Appearances</u>:
Andrew K. Cuddy
Jason H. Sterne
Law Office of Andrew K. Cuddy
Auburn, New York
*Counsel for Plaintiff*

Mark C. Rushfield
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court are Defendant's Motion for Summary Judgment, (Doc. 11), and

Plaintiff's Motion for Summary Judgment, (Doc. 14).  Plaintiff C.H. ("CH") brings this action,

individually and on behalf of her child F.H. ("FH"), pursuant to the Individuals with Disabilities

Education Improvement Act ("IDEIA"), 20 U.S.C. §§ 1401 *et seq.*,[1] against Defendant Goshen

Central School District (the "District").  Plaintiff seeks review of an administrative decision by a

---

[1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the IDEIA.  All references to and cases cited herein discussing the IDEA remain authoritative.

State Review Officer ("SRO") at the New York State Education Department affirming in part and reversing in part the decision of an Impartial Hearing Officer ("IHO").[2]

The IHO found that (1) the parents' request for reimbursement for private tutoring services was properly raised in their Due Process Complaint ("DPC"), (District Ex. 1); (2) the adequacy of reading services for both the 2009-10 and 2010-11 school years was properly raised in the DPC; (3) the claim for additional speech and counseling services as a remedy was not properly raised in the DPC; (4) the parents' claim for additional or compensatory services for the 2009-10 school year was not moot; (5) any procedural errors that did not result in a denial of a free and appropriate public education ("FAPE") regarding the 2009 Individualized Education Program ("IEP") were moot; (6) although the reading goals on the 2009-10 IEP were vague and inadequate, they did not result in the denial of a FAPE for the 2009-10 school year; (7) the special education program and services provided during the 2009-10 school year were adequate and did not result in a denial of a FAPE;[3] (8) the 2010 IEP denied FH a FAPE; (9) termination of 2010 Extended School Year ("ESY") services was not appropriate; and (10) FH was entitled to, among other things, ESY services consisting of 100 hours of instruction in the Orton-Gillingham method.  (IHO Decision 22-25, 27-29, 31, 33-34, 36-38.)

The SRO agreed with the IHO that the 2009 IEP did not result in a denial of a FAPE, but disagreed with the IHO with respect to the adequacy of the goals, including the reading goals,

---

[2] "IHO Decision" will refer to the decision of IHO Robert Briglio, Esq., dated May 2, 2011.  This document forms part of the administrative record that was filed under seal with this Court.  (Doc. 21.)  "SRO Decision" will refer to the Decision of SRO Justyn P. Bates, dated July 11, 2011, in Appeal No. 11-058, which is available at http://www.sro.nysed.gov/decisionindex/2011/11-058.pdf.  The exhibits cited herein form part of the administrative record presented to the SRO and filed under seal with this Court.  (Doc. 21.)  They are referred to here according to the name of the party that apparently submitted them – "Parent Ex." and "District Ex."

[3] The IHO also found that, were there to have been a denial of a FAPE for the 2009-10 school year, it would have been appropriate to award reimbursement for the parents' unilateral hiring of a private tutor in the summer of 2010.  (IHO Decision 31-32.)  Having found that CH was provided with a FAPE during the 2009-10 school year, however, the IHO denied the parents' reimbursement claim.  (*Id.* at 31.)

finding them to be appropriate.  (SRO Decision 15-17.)  With respect to the 2010 IEP, the SRO disagreed with the IHO, finding that the DPC "[did] not contain any allegations in which the parents assert that [the] May 2010 IEP was deficient."  (*Id.* at 17.)  The SRO went on to find in the alternative that, even if properly raised, the 2010 IEP did not result in a denial of a FAPE because:  (1) the annual goals were sufficiently linked to the student's educational needs; (2) the record indicated that counseling services were not required; (3) the record did not support provision of speech-language consultation services; (4) the need to provide Orton-Gillingham services in particular, as opposed to another methodology chosen by the teacher, was not supported by the record; and (5) the record did not support a finding that ESY services were necessary.  (*Id.* at 18-25.)

Defendant seeks an Order from this Court affirming the decision of the SRO (1) that the Plaintiff is barred from challenging the 2010 IEP because it was not the subject of the Plaintiff's DPC; and (2) that a FAPE was provided for each of the school years.  (D's Mem. 3, 5.)[4]  Plaintiff seeks an Order annulling the decision of the SRO, granting the relief directed by the IHO, and providing reimbursement for the tutoring services.  (Complaint, (Doc. 1), ¶¶ 62, 66.)[5]

For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

---

[4] "D's Mem." refers to Defendant's Memorandum of Law in Support of Motion for Summary Judgment.  (Doc. 13.)

[5] I refer here only to the Complaint, because the bulk of Plaintiff's brief is a nearly verbatim copy of her brief submitted to the SRO, with only a short paragraph or two added to specifically address the SRO's decision, and thus addresses few aspects of the SRO's decision.  (*See* Plaintiff's Memorandum of Law in Support of its [*sic*] Motion for Summary Judgment ("P's Mem."), (Doc. 18), 1-2, 4-15.)  Section VI of Plaintiff's brief is a nearly verbatim copy of a portion of her brief submitted to the IHO.  (*Id.* at 12-13.)  Additionally, Plaintiff has failed to submit a brief opposing Defendant's Motion for Summary Judgment.  By failing to confront the SRO's decision head on, and by failing to address Defendant's arguments in support thereof – and instead essentially cutting and pasting from previous briefs which were drafted at different stages of the case under different procedural postures – Plaintiff's counsel seem to have done their client a disservice.  These failures have not affected my decision, except to the extent that failure to address an issue results in abandonment.  *See infra* Section III.B.2.i, III.B.3.

## I. Background

The relevant facts are undisputed except where noted.  The reader is directed to the decision of the SRO, which provides a thorough recounting of the factual background of this case.  I recount here only some of the facts.

FH was a student in the Goshen Central School District with a history of learning disabilities.  (SRO Decision 2.)  For most of her elementary school education, including the fourth-grade (2009-10) and fifth-grade (2010-11) years at issue here, FH was classified as a student with a learning disability.  (*Id.*; *see* D's 56.1 ¶¶ 2, 8.)[6]  During her third-grade year – during which she was placed in a general education classroom and received other program modifications, (SRO Decision 2) – two evaluations of FH were conducted, both of which were relied upon in developing the 2009 and 2010 IEPs at issue here.  (*See* District Ex. 5, at 10; District Ex. 6, at 8.)[7]

### A.  *Formal Evaluations of FH*

#### 1.  Geffner Evaluation

On January 30, 2009, at the request of the parents, Dr. Donna Geffner, a private speech-language pathologist, conducted an Auditory and Language Processing Re-Evaluation of FH.  (SRO Decision 2; IHO Decision 2.)  Dr. Geffner had previously evaluated FH (in November 2005 and May 2007) at which time she identified "disorders of auditory and language

---

[6] "D's 56.1" refers to Defendant's Rule 56.1 Statement in Support of Motion for Summary Judgment.  (Doc. 12.)

[7] Other evaluations were conducted and are part of the record, including an October 2009 Occupational Therapy evaluation, (Parent Ex. BB), and a December 2009 informal evaluation conducted at the request of the parents by Diana Hanbury King, (Parent Ex. AA).  Because neither IEP includes occupational therapy services, and the parents nowhere argue that it should, the former is irrelevant.  In her letter, Ms. King – an expert specializing in dyslexia and a Fellow at the Academy of Orton Gillingham Practitioners & Educators – noted FH's "speech difficulties," and was "surprised when [FH's] mother told me that speech therapy had been discontinued."  (*Id.* at 1.)  She reported the results of a number of tests, and recommended, among other things, resuming speech therapy, and continuing to work over the summer to prepare for the fifth grade.  (*Id.* at 1-3.)  The record does not reveal whether this letter was ever sent to the District; it certainly was not noted as considered on the 2010 IEP.  (*See* District Ex. 6, at 8.)

processing, and phonological processing."  (SRO Decision 2 n.2 (internal quotation marks omitted); *see* IHO Decision 2.)  Dr. Geffner found that FH had "excellent receptive and expressive language skills" but continued to suffer from "an auditory processing disorder . . . albeit with some improvement," including continued "difficulty discriminating speech in noise," "impl[ying] that she will have difficulty hearing the message clearly in less than optimum listening conditions (*i.e.*, a noisy classroom) and sorting relevant from irrelevant information." (Geffner Report 8; *see* IHO Decision 2.)[8]  Dr. Geffner also found that "speech production difficulties continue to affect intelligibility and need to be addressed in therapy," and that "[s]hort term memory weakness persists."  (Geffner Report 8.)  Dr. Geffner made four specific recommendations:  continue classroom accommodations (*i.e.*, seating near the teacher, quiet area testing); reinstate speech-language therapy; use the "Earobics" computer program; and "[c]onsider a personal FM system" or a "soundfield system . . . if [FH] would be too self-conscious with a personal system."  (*Id.* at 8-9; *see* SRO Decision 3; IHO Decision 3.)

2.  Busby Evaluation

On February 4, 2009, pursuant to an agreement between the parents and the District, Dr. Suzanne Busby, a licensed psychologist with the Developmental Assessment & Intervention Center in Bedford Hills, New York, conducted a Psychoeducational Evaluation of FH.  (SRO Decision 3; IHO Decision 3; P's 56.1 ¶ 3.)[9]  The parents and the District mutually agreed that this would constitute FH's statutorily-required triennial evaluation.  *See* 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(4).

---

[8] "Geffner Report" refers to the Auditory and Language Processing Re-Evaluation prepared by Donna Geffner, Ph.D., CCC-SLP/A, based on the January 30, 2009 re-evaluation of FH.  (District Ex. 11.)

[9] "P's 56.1" refers to Plaintiff's Statement of Material Facts Not in Dispute.  (Doc. 16.)

(Tr. 486.)[10]  The stated purpose of the evaluation was to "ascertain [FH's] current level of functioning and monitor her progress," and to provide her parents with "a better understanding of [FH's] learning style, as well as guidance regarding interventions that would address her weaknesses and help her reach her potential."  (Busby Report 1; IHO Decision 3.)[11]  Dr. Busby administered numerous formal tests during the course of this evaluation, the results of which are recounted in great detail in her report, (*see generally* Busby Report), and are fairly summarized by both the IHO, (*see* IHO Decision 3-5), and the SRO, (*see* SRO Decision 3-4).  Based on her testing, Dr. Busby diagnosed FH with "Reading Disorder (DSM-IV 315.00)," otherwise known as dyslexia. (Busby Report 19, 21.)  She noted that, although FH has "excellent comprehension abilities on a task in which she was asked to read passages," and her "ability to read simple sentences quickly . . . was age appropriate," she demonstrated other weaknesses (*e.g.*, below average rate of reading and accuracy) which led to her diagnosis.  (*Id.* at 13, 19; *see* SRO Decision 4.)

Among the numerous recommendations made in her report, Dr. Busby specifically recommended "specialized intervention to address weaknesses related to [FH's] dyslexia" in the form of "individualized direct instruction" with a "professional such as a reading specialist . . . , preferably one trained in Orton-Gillingham methods."  (Busby Report 21.)  Dr. Busby also noted that "it may be the case that a smaller classroom with more supports available would be beneficial for [FH]."  (*Id.*)

---

[10] "Tr." refers to the transcript of the hearing held before the IHO.  This document forms part of the administrative record that was filed under seal with this Court.  (Doc. 21.)

[11] "Busby Report" refers to the Psychoeducational Evaluation prepared by Suzanne Busby, Ph.D., based on her February 4, 2009 evaluation of FH.  (District Ex. 10.)

B. *2009-10:  FH's Fourth Grade Year*

    1.  <u>May 8, 2009 CSE Subcommittee Meeting</u>

On May 8, 2009, a Subcommittee of the Committee on Special Education ("CSE") met to conduct FH's annual review for her third-grade year, and to develop the 2009 IEP for her fourth-grade year.  (SRO Decision 5.)  Among those in attendance were the parents, Patricia Henchy (a family friend and Orton-Gillingham instructor who would later provide private tutoring services to FH),[12] and Dr. Busby.  (*Id.*)  At this meeting, the Subcommittee relied upon the Busby Report, the Geffner Report, a March 17, 2009 Social History, a February 25, 2009 Classroom Observation, an August 5, 2003 Medical Evaluation, and a May 8, 2009 Annual Review Summary.  (Parent Ex. F, at 8-9.)[13]

During this meeting, the Subcommittee formally classified FH as "learning disabled" for her fourth grade year, (D's 56.1 ¶ 2), recommended a general education setting, and proposed certain special education programs and related services, including:  a 45 minute per day special class in reading in a 2:1 non-integrated setting; one hour per week of indirect consultant teacher services in a flexible setting; a 15 minute per week speech/language consultation in the classroom; and 18 hours of ESY services to prevent regression of English Language Arts ("ELA") skills, (*see* SRO Decision 6; IHO Decision 7).

    Regarding the special class in reading, the Subcommittee noted:

---

[12] The record is clear that the parents retained Ms. Henchy for a six-week summer program for FH in 2010, (*see* Parent Ex. WW (invoice from Henchy to Parents)), during which time Henchy worked on Orton-Gillingham skills with FH, (*see* Parent Ex. NNN (email from Henchy describing her summer work); IHO Decision 15).  But the record does not reflect what services, if any, were provided during the winter of 2009-10, the period for which the DPC requests reimbursement.

[13] "Parent Ex. F" is a one-page September 16, 2009 cover letter from the District to the parents attaching a twelve-page corrected version of the 2009 IEP developed after the May 8, 2009 meeting.  As the 2009 IEP at issue here is dated November 16, 2009, (District Ex. 5), I refer to Parent Ex. F only for historical context.  When I refer to page numbers of Parent Ex. F, I refer to the page numbers of the IEP, not including the cover letter.

> Dr. Busby indicated that specific remediation that includes a multi-sensory sequential systematic phonetic based instruction such as Orton-Gillingham instruction should be used. The committee determined that a specific period of the day should be dedicated to this reading/ELA instruction to help remediate the described deficits.

(Parent Ex. F, at 8.) Regarding the general education classroom setting, the Subcommittee noted:

> Discussion related to a co-teach classroom was had and all agreed this was not appropriate because of [FH's] concern for her classmates when they are redirected or refocused. The committee determined that a consultant teacher for one hour a week that works with [FH's] general education classroom teacher would most appropriately meet her needs. All present agreed with this recommendation.

(*Id.*) Regarding ESY services, the Subcommittee noted:

> Dr. Busby initiated conversation related to summer services. [CH] shared her concern related to the long break over the summer as well. The committee discussed providing three one hour sessions of reading/ELA instruction for six weeks to prevent regression. Dr. Busby indicated the eighteen hours of instruction would be appropriate for [FH] and all present agreed with the recommendation.

(*Id.*)

The Subcommittee set forth eighteen annual goals in the 2009 IEP, addressing the areas of study skills, reading, spelling, writing, mathematics, social/emotional/behavioral skills, keyboarding, and maintenance of previously learned skills. (SRO Decision 6.) The parents apparently had some concern at the time with vagueness of these goals, as they sent a letter to the District on September 18, 2009 expressing dissatisfaction. (*See* Parent Ex. FF, at 2 ("We want to know who developed the goals and objectives on [FH's] IEP and was responsible for interpreting them from the CSE meeting/recent evaluation and incorporating them formally into the IEP. This is a direct question we would like an answer to in writing.").) The parents also expressed

concern with the qualifications of FH's general and special education teachers, and requested

specific information about them.  (*See id.* at 3.)  The District provided the teachers' qualifications

by letter dated September 23, 2009.  (Parent Ex. GG.)

      2.  November 16, 2009 CSE Subcommittee Meeting

On November 16, 2009, the CSE Subcommittee re-convened to review FH's program.

According to the IEP that ultimately issued, in addition to the items relied upon at the May 8,

2009 meeting, the Subcommittee also relied upon the Occupational Therapy evaluation.  (District

Ex. 5, at 9-10.)  In attendance were FH's teachers and other administrators, as well as CH.  (*Id.* at

8.)  At this meeting, CH challenged the District's assessments that FH was reading at grade level,

citing the weaknesses identified by Dr. Busby.  (*Id.*)  With respect to the annual goals, CH raised

objections, including that "she wants the goals to be more specific."  (*Id.*)  She also voiced

concern about adequate support for FH's special education teacher.  (*Id.*)  According to the IEP,

"[i]t was decided that Mrs. Piaquadio [FH's special education teacher] will contact Dr. Busby,

Dr. Henchy and/or Mrs. King [another of FH's private tutors], once written consent is received,

so that she can discuss the program with them personally."  (*Id.*)  The record reveals that the

District requested such consent several times, but never received it.  (*See* SRO Decision 8, 17

n.15.)  The IEP remained unchanged.

      3.  Year-End Report

At the end of the 2009-10 school year, the District issued a progress report showing FH's

progress towards her annual goals as set forth on the 2009 IEP.  (District Ex. 8.)  The report

indicates that at the end of the fourth grade, FH had achieved thirteen of eighteen annual goals,

and was progressing satisfactorily toward the remaining five.  (*See* District Ex. 8; SRO Decision

10; IHO Decision 14.)  According to the SRO, FH's report card for the end of the 2009-10

school year indicates that she met State learning standards in 43 of 49 areas reviewed, partially

met the standards in two areas, and needed improvement only in the four areas of math fluency

with single digit facts.[14] (SRO Decision 10; *see* District Ex. 7; IHO Decision 14-15.)

   C.  *2010-11:  FH's Fifth Grade Year*

        Before the end of the 2009-10 school year, the CSE Subcommittee convened again to

review FH's progress and to develop the 2010 IEP for her fifth-grade school year.  District

administrators, the school psychologist, FH's teachers, and her parents all attended.  (District Ex.

6, at 7.)[15]  The Subcommittee considered essentially the same evaluations as for the prior year,

but also considered some updated information from FH's annual review, including reports from

her teachers and samples of her work.  (*Id.* at 7-8.)  During this meeting, the Subcommittee

continued FH's classification as a student with a learning disability, and proposed continuing her

general education setting, her 45 minute per day special class in a 2:1 non-integrated setting (in

ELA as opposed to reading), and her one hour per week indirect consultant teacher services.  (*Id.*

at 1, 3; SRO Decision 9; IHO Decision 13.)  The speech-language consultation and ESY services

were removed.  (SRO Decision 9-10; IHO Decision 13.)  Regarding the latter, the Subcommittee

noted that "An [ESY] program is not recommended because no regression has been observed.

All present agreed to these recommendations."  (District Ex. 6, at 8.)

        The Subcommittee set forth eleven annual goals in the 2010 IEP, addressing the areas of

study skills, reading, and writing (including goals relating to spelling).  (*Id.* at 9-10; SRO

---

[14] It appears that in fact 50 areas were reviewed on FH's report card, and that she met state standards on 44 of them. (District Ex. 7.)  It should also be noted that the rubric for math facts is different from the rubric for the other academic areas, having only two categories:  "mastered" and "needs improvement."  (*Id.*)

[15] District Ex. 6 is the 2010 IEP at issue here, bearing the date May 10, 2010, which purports to describe the discussions at the May 10, 2010 Subcommittee meeting and the resulting special education proposals.  The record is not clear to what extent a previous draft of this document was available at the May 10, 2010 meeting itself. (*Compare* DPC 1 ("The Parents did not receive a draft IEP at the [May 10, 2010] meeting . . . ."), *with* Tr. 69 (Ms. Butler testifying that a draft of the IEP was available for the meeting).)  The record is also not clear as to when this document issued, although it clearly did not issue before the June 18, 2010 filing of the DPC.  (*See* DPC 1 ("The Parents . . . have not yet received the IEP for the 2010-2011 school year.").)

Decision 9; IHO Decision 14.)  Social/emotional need goals were discontinued, (IHO Decision

14), apparently based on the report of FH's counselor concluding that "[t]here are no

social/emotional concerns that should be addressed through special education at this time,"

(District Ex. 6, at 6-7).  Math goals were also discontinued, (IHO Decision 14), apparently based

on the report of FH's general education teacher that "[FH] is working on grade level in math and

has scored well on math assessments" and "has improved her fluency in mathematic facts,"

(District Ex. 6, at 7).

### D.  Procedural History

On June 18, 2010, the parents mailed to the District a DPC.  (District Ex. 1.)  The first

paragraph of the DPC references the November 2009 IEP and its associated program

modifications.  (DPC 1.)  The second paragraph references the May 10, 2010 meeting, noting

that "[w]ith her reading deficits and the fact that science, social studies and math require reading

to understand content, it is imperative that [FH] receive support in these areas as well as ELA."

(*Id.*)  The DPC goes on to express concern regarding the "methodology being utilized to address

[FH's] reading deficits," suggesting that FH's parents desired an Orton-Gillingham

methodology.  (*Id.* at 2.)  The DPC mentions other concerns with the May 10, 2010 meeting, and

then goes on to request an impartial hearing under the IDEIA and state regulations, setting forth

a non-exclusive list of the "bases for this request" that pertain exclusively to the 2009 IEP.  (*Id.*

at 2-4; *see infra* Section III.A.2.)

The DPC specifically requests the following remedies:  (1) "Provision of an appropriate

IEP, developed with the equal participation of the Parents"; (2) "Provision of an actual Orton-

Gillingham based program taught by an individual who is adequately trained to provide

instruction"; (3) "Provision of a 1:1 [ESY] program designed and implemented by a 'certified'

Orton-Gillingham instructor"; (4) reimbursement for private tutoring services; (5) attorney's fees

and costs; and (6) any further relief that the IHO deems just and proper.  (*Id.* at 4-5.)

       An impartial hearing was held before the IHO on September 20-21, 2010, November 29-

30, 2010, December 1, 2010, and February 16, 2011.  (IHO Decision 1.)  The IHO heard

testimony of Barbara Butler (Director of Pupil Personnel Services at the District), Katherine

Morino (FH's general education teacher), Kristen Bownas (the school psychologist), Dana

Piaquadio (FH's special education teacher), CH, Patricia Henchy, and Dr. Busby.  On May 2,

2011, the IHO issued a decision finding no violation of the IDEIA for the 2009-10 school year,

and granting relief for violations of the IDEIA for the 2010-11 school year.

       The District appealed the ruling of the IHO, and the parents cross-appealed.  The SRO

received the administrative record, and on July 7, 2011, issued a decision affirming the IHO with

respect to the 2009-10 school year, and reversing the IHO with respect to the 2010-11 school

year.

       On October 3, 2011, Plaintiff initiated this action by filing the Complaint, seeking review

of the SRO's decision pursuant to 20 U.S.C. § 1415(i)(2)(A).  (Doc. 1.)  The Court has received

the administrative record from the SRO.  Neither party has introduced additional evidence before

this Court.  The parties have cross-moved for summary judgment, as is customary in IDEIA

cases.  (Docs. 11, 14.)

## II.  <u>Applicable Legal Standard</u>

       The IDEIA serves to promote the education of children with disabilities.  *See, e.g.*,

*Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citing *Bd. of Educ. v.*

*Rowley*, 458 U.S. 176, 179 (1982)).  Under the statute, states that receive federal funding must

provide disabled children with a FAPE, 20 U.S.C. § 1412(a)(1), which includes "special

education and related services" tailored to meet the unique needs of the particular child, *id*. §
1401(9).

"The 'centerpiece of the statute's education delivery system' is the IEP, an educational
program tailored to provide appropriate educational benefits to individual disabled students."
*Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (quoting *Honig v.
Doe*, 484 U.S. 305, 311 (1988)).  The IEP must be developed annually by "[a] school official
qualified in special education, the child's teacher, the child's parents, and, where appropriate, the
child," *Walczak*, 142 F.3d at 122, and must comply with both the procedural and the substantive
requirements of the IDEIA, *see* 20 U.S.C. § 1414.  Courts engage in a two-pronged review,
asking first "whether the State complied with the procedures set forth in the Act" in developing
the IEP, and second, "whether the IEP developed through the Act's procedures is reasonably
calculated to enable the child to receive educational benefits."  *M.H. v. N.Y.C. Dep't of Educ.*,
685 F.3d 217, 245 (2d Cir. 2012) (alteration and internal quotation marks omitted).

Procedural violations warrant relief only if they "'(I) impeded the child's right to a
[FAPE]; (II) significantly impeded the parents' opportunity to participate in the decision-making
process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of
educational benefits.'"  *Id.* (alteration in original) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).
Among the procedural requirements of the IDEIA is that the IEP contain "measureable annual
goals for the child" as well as "the method used to measure the student's progress towards those
goals."  *Id.* (citing 20 U.S.C. § 1414(d)(1)(A); N.Y. Comp. Codes R. & Regs. tit. 8, §
200.4(d)(2)).  In that regard, "the IEP [must] include short-term and long-term academic and
nonacademic goals for each student, as well as evaluative procedures for measuring a student's
progress in achieving the short- and long-term goals contained in the IEP."  *Id.* (citing 20 U.S.C.

§ 1414(d)(1)(A)(i)(III); 34 C.F.R. § 300.320(a)(2)-(3); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(ii)).

Substantively, the IDEIA "does not itself articulate any specific level of educational benefits that must be provided through an IEP" that would meet the "reasonably calculated to enable the child to receive educational benefits" standard. *Walczak*, 142 F.3d at 129-30 (internal quotation marks omitted). Courts interpreting the IDEIA make clear, however, that a school district is not required to furnish "'every special service necessary to maximize each handicapped child's potential,'" *A.C. v. Bd. of Educ.*, 553 F.3d 165, 173 (2d Cir. 2009) (quoting *Rowley*, 458 U.S. at 199); rather, a "district fulfills its substantive obligations under the [IDEIA] if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted). The IEP need not "provide[] everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (internal quotation marks omitted); it need only provide the child with a "basic floor of opportunity," *Rowley*, 458 U.S. at 201. Additionally, the "services must be provided in the least restrictive setting consistent with a child's needs." *Walczak*, 142 F.3d at 122.

Motions for summary judgment customarily resolve IDEIA actions in federal court. *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003). Under the IDEIA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion. *Id.* Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted). In reviewing an action pursuant to Section 1415(i) of the IDEIA, the district court "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380-81 (2d Cir. 2003).

      Although the court engages in an independent review of the administrative record and makes a determination based on the preponderance of the evidence, its review of the state administrative decisions is limited.  *See Rowley*, 458 U.S. at 205-06; *M.H.*, 685 F.3d at 240; *Walczak*, 142 F.3d at 129.  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give *due weight* to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Walczak*, 142 F.3d at 129 (emphasis added) (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 244.  In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  *M.H.*, 685 F.3d at 244.  The court's determination "must also be colored by an acute awareness of institutional competence and role."  *Id.*  Thus, more deference should be granted to "determinations regarding the substantive adequacy of the IEP" than to determinations regarding procedural adequacy.  *Id.*  Deference to administrative decisions is particularly warranted where the district court's review, as here, "is based entirely on the same evidence as that before the SRO."  *Id*.

      Reviewing courts should also be mindful that they must not "substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458

U.S. at 206.  Where the IHO and the SRO have reached contrary conclusions, the general rule is

that unless one decision is "insufficiently reasoned to merit . . . deference," "reviewing courts are

not entitled to adopt the conclusions of either state reviewer according to their own policy

preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO

as the final state administrative determination."  *M.H.*, 685 F.3d at 246; *accord R.E. v. N.Y.C.*

*Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012).

## III.  Discussion

### A.  *Threshold Inquiry:  Issues Before the Court*

There are statutory and regulatory limits to the scope of judicial review of administrative

decisions under the IDEIA.  I therefore must consider these threshold issues first.

#### 1.  Legal Standards

The IDEIA provides that "[t]he party requesting the due process hearing shall not be

allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the

other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).  Accordingly, "the party requesting

the hearing [must] lay out specifically in the [DPC] the issues that will be before the hearing

officer," *C.F. v. N.Y.C. Dep't of Educ.*, No. 11-CV-157, 2011 WL 5130101, at *12 (S.D.N.Y.

Oct. 28, 2011), and courts have authority to review only those issues, *see B.P. v. N.Y.C. Dep't of*

*Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and

therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial

hearing request or agreed to by the Defendant."); *M.R. v. S. Orangetown Cent. Sch. Dist.*, No.

10-CV-1800, 2011 WL 6307563, at *13 (S.D.N.Y. Dec. 16, 2011) ("[T]here is a statutory bar to

the IHO considering issues not raised in the demand for a due process hearing, absent the

district's or IHO's consent to a timely amendment.") (citations omitted); *cf. M.H.*, 685 F.3d at

250-51 (Defendant "open[ed] the door" to issues outside the DPC by arguing those issues to

meet its burden).  Administrative remedies are not exhausted as to issues not raised in the DPC, and failure to exhaust deprives the district court of subject matter jurisdiction.  *See A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 216 (S.D.N.Y. 2010).

Furthermore, issues that were decided by the IHO and not appealed or cross-appealed by the party against which they were decided are binding against that party, and on the SRO and this Court, as to that party.  *See D.N. v. N.Y.C. Dep't of Educ.*, No. 11-CV-9223, 2012 WL 6101918, at *4-5 & n.6 (S.D.N.Y. Dec. 10, 2012) (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(j)(5)(v), which states that the "decision of the [IHO] shall be binding upon both parties unless appealed to the [SRO]"); *accord F.B. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1669, 2013 WL 592664, at *14 (S.D.N.Y. Feb. 14, 2013); *J.F. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2184, 2012 WL 5984915, at *9-10 (S.D.N.Y. Nov. 27, 2012).

Thus, this Court has the power to decide only those issues that were both properly raised in the DPC and not waived by failing to appeal or cross-appeal to the SRO an adverse finding by the IHO.

### 2. Application

The scope of Plaintiff's DPC here is by no means clear, and has been the subject of confusion at all levels of the process.  (*See* District Ex. 2 (Defendant's response to DPC questioning its scope and assuming for the sake of response that it challenges both school years); SRO Decision 17 (DPC "does not contain any allegations in which the parents assert that [the] May 2010 IEP was deficient"); IHO Decision 23 (DPC properly raised adequacy of reading services for both years, but not the claim for speech and counseling services as a remedy).) Indeed, Defendant objected throughout the hearing to matters it considered to be outside of the DPC, thereby precluding implicit agreement to an expanded hearing scope.  (*See, e.g.*, Tr. 99 (counseling goals); *id.* at 405 (program modifications, accommodations, and aids and supports;

17

*id.* at 422 (phonological assessments); *id.* at 494 (keyboarding goals); *id.* at 562 (occupational therapy).)  Furthermore, the parents did not cross-appeal to the SRO all issues decided adversely to them by the IHO.  Thus, I must engage in a preliminary inquiry to determine which issues I may decide.

> i.  2009-10 School Year

The only aspects of the DPC that relate to the 2009 IEP are the specifically-enumerated bases for the impartial hearing request.  (*See* DPC 2-4.)[16]  Read together, they sufficiently raise the issue of the adequacy of the 2009 IEP with respect to:  the annual goals; the absence of a specified methodology to address FH's particular disability; the failure to have appropriately trained staff; the failure to consider the recommendations of outside evaluators; and the need to reimburse parents for private tutoring during the winter of 2009-10.[17]  (*Id.* at 3-4.)

I find, however, that the DPC does not raise the issue of reimbursement for private tutoring by Ms. Henchy over the summer of 2010; there is no indication in the DPC that the parents were going to retain private tutoring services over the summer, let alone that they were going to seek reimbursement for them.  The DPC instead set forth what apparently was the statutorily-required "proposed resolution of the problem to the extent known and available to the party at the time," 20 U.S.C. § 1415(b)(7)(A)(ii)(IV), and failed to include anything but a reimbursement claim for "reading services that *were* paid for privately by the Parents," (DPC 5 (emphasis added)), even though Ms. Henchy's services were clearly both known and available to the parents.

---

[16] The prefatory expression of concern "regarding the methodology being utilized to address [FH's] reading deficits" – relating both to the District's alleged refusal to "implement [a] specific methodology" and the lack of credentials of her reading tutor – is duplicative of items 3 and 4 of the specific bases.  (*Compare* DPC 2, *with id.* at 3-4.)

[17] Again, the Court cannot find evidence in the record, other than the DPC itself, that the parents used private tutoring services during the winter of 2009-10.

In addressing the adequacy of the 2009 IEP goals, the IHO focused only on the reading goals, finding them to be vague but excusing the vagueness because it did not result in a denial of a FAPE for the 2009-10 school year.  (IHO Decision 24-25.)[18]  The IHO further found that the decision to place FH in a general education was appropriate and did not result in a denial of a FAPE.  (*Id.* at 27.)  The IHO also found that not including a "specific instructional methodology" on the 2009 IEP was not a procedural violation, (*id.* at 28), and ultimately concluded, based on a review of FH's work over the 2009-10 school year, that the placement of FH was appropriate, (*id.* at 30-31).  The parents' cross-appeal of the IHO Decision raised only that "[t]he IHO erred in finding no denial of [a] FAPE for the 2009/10 school year," and "[s]pecifically, [the IHO] concluded that the annual goals, the basis of the IEP, were flawed, but excused this violation." (Answer to Petition (with Cross Appeal) ¶¶ 33-34; *see* SRO Decision 17 ("[N]o other allegations were raised in the parents' cross-appeal . . . .").)[19]

I find, as the SRO apparently implicitly did, that while the DPC raises numerous issues with the 2009 IEP, only the goals were raised in the parents' cross-appeal.[20]  (SRO Decision 17.) Thus, because the IHO decided the appropriateness of the program and services of the 2009 IEP against the parents, the only issue with respect to the 2009 IEP properly before this Court is the adequacy of the goals and whether their inadequacy resulted in a denial of a FAPE for 2009.[21]

---

[18] The IHO apparently viewed the DPC as only raising an issue with the reading goals on the 2009 IEP.  The IHO did not explain why he so construed the DPC, but it appears to have resulted from the DPC's clear emphasis on reading.  (*See, e.g.*, DPC 2 ("The current program does not address [FH's] needs, most specifically her reading disability."); *id.* at 3 ("The goals, in particular, the reading goals, . . . are not sufficient to address the needs associated with her reading disability.").)

[19] The parents' Answer to Petition (with Cross Appeal), dated June 13, 2011, forms part of the administrative record that was filed under seal with this Court.  (Doc. 21.)

[20] I will construe the cross-appeal as addressing all the goals, not just those related to reading.

[21] Among the adverse findings of the IHO relevant to the 2009 IEP that Plaintiff failed to cross-appeal were that "the School District considered the [outside experts' recommendations] in making the May 8, 2010 [*sic*] IEP recommendations for [FH] for the 2009/10 school year," (IHO Decision 26), "the parents failed to raise the issues of the provision of speech-language and counseling services in the [DPC] notice," "the parent's [*sic*] allegations of

  ii. <u>2010-11 School Year</u>

  As to the 2010-11 school year, the DPC fails to specifically enumerate issues with the

2010 IEP as bases for the impartial hearing request, as it did for the 2009 IEP.  Indeed, because

the 2010 IEP did not issue until after the DPC was filed, the DPC could not have raised issues

with respect to the formal 2010 IEP.  Given that Plaintiff had ample time between the filing of

the DPC and the conclusion of the impartial hearing to amend the DPC, yet failed to do so to

specifically raise issues with the 2010 IEP, I could on this basis alone agree with the SRO and

find that the parents failed to raise any issues with the 2010 IEP in their DPC, foreclosing review

of the same.  *See, e.g.*, *M.R.*, 2011 WL 6307563, at *13.  Giving the parents the benefit of the

doubt, however, I will not apply this formalistic view of the DPC, and instead will look to see

whether it reasonably raised issues with the expected 2010 IEP based on the May 10, 2010

meeting.

  The DPC raises certain grievances with the May 10, 2010 meeting, but it is less than clear

to what extent these constitute an actual raising of issues pursuant to 20 U.S.C. § 1415(f)(3)(B).

For example, although the DPC states that the "Parents requested that [FH] receive Consultant

Teacher services across all core subjects" because of "her reading deficits and the fact that

science, social studies and math require reading to understand content," (DPC 1) – suggesting

that they believed such services would not be provided – the 2010 IEP reflects the provision of

such Consultant Teacher services, which "will support ELA skills, particularly writing and

---

procedural errors regarding the development of the November 2009 IEP that did not result in a denial of a FAPE had become moot," "the November 2009 CSE subcommittee's decision to place the student in a general education class for purposes of the student's LRE [least restrictive environment] was appropriate," "the parents failed to cooperate with the district in its effort to address alleged deficiencies in the annual goals contained in the November 2009 IEP," and "the lack of a specific methodology in the November 2009 IEP did not constitute a procedural violation depriving the student of a FAPE," (SRO Decision 15 n.14 (citing IHO Decision 22-25, 27-28)).  As mentioned above, these findings are binding upon the Plaintiff and this Court.  *See, e.g., D.N.*, 2012 WL 6101918, at *4-5 & n.6.

spelling, *across the curriculum*," (District Ex. 6, at 1 (emphasis added)).  This statement

therefore cannot be a grievance with the IEP, and if it is, it is moot.

   The DPC also contains the following paragraph:

> Also at this annual Review, the math goals were never discussed
> from the IEP, Speech Language services remained as just a consult
> once a week for 15 minutes, and [ESY] services were removed.
> The District has not shown that [FH] does not regress during time
> away from instruction and removed the ESY services with no
> evaluative data to support the change to the IEP.  The Parents
> asked who the reading tutor would be for the next school year, and
> were told that there were no guarantees that it would be the same
> tutor and provided innaccurate [*sic*] information about this
> individual's credentials.  This does not afford the Parents the
> knowledge that the tutor will be qualified to address with [FH's]
> specific reading needs.

(*Id.* at 2.)  But some of the alleged deficiencies that would seem to underlie these concerns are

either contradicted by or absent from the 2010 IEP itself:  FH's math progress was discussed,

(District Ex. 6, at 7 ("Mrs. Morino indicated that [FH] is working on grade level in math and has

scored well on math assessments.  She indicated that [FH] has improved in her fluency in

mathematic facts.  The committee recommended possible intervention strategies to improve her

fluency.")); speech-language services did not remain on the IEP, (*see id.* at 1-2)[22]; and the

removal of ESY services was premised on observation, (*see id.* at 8 (ESY services removed

"because no regression has been observed")).  Furthermore, some of the DPC's arguably relevant

proposed remedies – "[p]rovision of an appropriate IEP, developed with the equal participation

of the parents," "[p]rovision of an actual Orton-Gillingham based program taught by an

individual who is adequately trained to provide instruction," and "[p]rovision of a 1:1 [ESY]

program designed and implemented by a 'certified' Orton-Gillingham instructor," (DPC 4) –

---

[22] I mention this not to suggest that the parents were satisfied with the removal – they were plainly not, as they were dissatisfied with only weekly speech-language consultation services – but simply to point out that the DPC seems to address the May 10, 2010 meeting, not the 2010 IEP.

when read in the context of the entire DPC, present as requests for compensatory services for the enumerated alleged failures of the 2009 IEP, not as standalone requests relating to the 2010 IEP.

Construing the DPC as broadly as reasonable, I find that it at least hinted at the issues of the non-existence or inadequacy of math goals, the adequacy of speech-language services, the need for ESY services, and the adequacy of the ELA special program (including whether an actual Orton-Gillingham based program was to be taught, and whether it would be taught by an appropriately qualified Orton-Gillingham teacher), such that the District was on notice. Furthermore, the IHO decided these issues against the Defendant, and Defendant appealed them, so they are all properly before this Court.

B. *Adequacy of the IEPs*

1. 2009 IEP – Adequacy of Goals and Denial of FAPE

Both the SRO and the IHO agreed that FH was not denied a FAPE for the 2009-10 school year by means of the inadequacies of the goals; indeed, both agreed that FH was not denied a FAPE at all. (SRO Decision 15-17; IHO Decision 24-31.) Deference to the conclusions of the administrators on this issue is particularly appropriate where they are both in agreement. Furthermore, as to the propriety of the goals themselves, deference to the reasoned conclusions of the SRO as the final state administrative determination is appropriate. *See M.H.*, 685 F.3d at 244. Indeed, "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the [IDEIA] requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382.

Plaintiff argues, in conclusory fashion, that the goals are egregious and are not "'likely to produce progress, not regression.'" (P's Mem. 7-8 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d Cir. 2006)).) But what is required, as the SRO noted, (*see* SRO Decision 16), is that the goals be designed both to "meet the child's needs that result from the child's disability to

enable the child to be involved in and make progress in the general education curriculum" and to "meet each of the child's other educational needs that result from the child's disability," 20 U.S.C. § 1414(d)(1)(A)(i)(II).  As the SRO noted, the goals here "were directly aligned with the student's needs as described in the present levels of academic performance section in the IEP." (SRO Decision 16 (referencing District Ex. 5, at 4).)

Plaintiff makes much of some goals using the word "maintain" – such as, "[FH] will maintain the ability to decode multi-syllabic word [*sic*] with prefixes a [*sic*] suffixes," (District Ex. 5, at 13) – characterizing this as a "hedge against regression."  (P's Mem. 7.)  But, as the SRO reasonably concluded, "these goals were appropriately designed for the student's ESY program during summer 2009 in order to prevent substantial regression, and were not designed as goals for the regular school year when new material would be introduced."[23]  (SRO Decision 16.)

Plaintiff also argues that no goals address "fluency," which the Busby Report identifies as a significant weakness in FH.  (P's Mem. 8.)  But the SRO reasonably found there to be goals addressing reading rate and accuracy, (SRO Decision 16), weaknesses on which Dr. Busby's finding of a fluency problem was premised, (*see* Busby Report 11-12 (noting that FH's reading rate and accuracy were below average, and concluding that "[d]espite her below average fluency, her comprehension was excellent")).

For the foregoing reasons, I agree with the decision of the SRO and find that FH was not deprived of a FAPE by virtue of the goals on the 2009 IEP.

---

[23] Although I find this conclusion to be reasonable and grant it due weight, the SRO's citation in support – the first quarterly report of FH's progress towards her annual goal, (Parent Ex. V) – does not support it.  Nevertheless, it is a reasonable conclusion given that the "maintenance" goals are set forth in a separate section of goals entitled "Other" (which section, as well as ESY services, is absent from the 2010 IEP), and given that earlier sections of the IEP contain achievement-type goals in the same subject areas.  (*See* District Ex. 5, at 10-13.)

2. <u>2010-11 School Year</u>

i. <u>Math Goals</u>

The DPC asserts that math goals – presumably those that would be included on the 2010 IEP – were never discussed at the May 10, 2010 meeting. (DPC 2.) Construing this grievance broadly, either the failure to discuss math goals could amount to a procedural violation that impeded the parents' opportunity to participate in the development of the IEP, or the failure to ultimately include such goals in the IEP could amount to a procedural violation that deprived FH of a FAPE.

Plaintiff makes no arguments in her brief regarding the failure to discuss math goals at the May 10, 2010 meeting. Plaintiff has therefore abandoned her claim as to this procedural defect. *See J.L. v. City Sch. Dist.*, No. 12-CV-1516, 2013 WL 625064, at *14 (S.D.N.Y. Feb. 20, 2013) (issues not addressed in summary judgment memoranda deemed abandoned); *Engwiller v. Pine Plains Cent. Sch. Dist.*, 110 F. Supp. 2d 236, 249 (S.D.N.Y. 2000) (failure to oppose issue in summary judgment brief constitutes abandonment); *cf. LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995) (issues not raised in appellate brief deemed abandoned).

In any event, as the SRO noted, the record indicates that FH's math performance was discussed at the annual review,[24] that 2010 annual goals were discussed, and that the annual goals "were developed from [FH's] present levels of functioning, as discerned through classroom work, teacher and parent reports, benchmark assessments, and previous goals, with input considered from parents, teachers, and support staff." (SRO Decision 18-19.) Furthermore, both parents were in attendance at the meeting, and thus had the opportunity for further discussion regarding math goals should they have so desired. (District Ex. 6, at 7.) And, although the IHO

---

[24] "Mrs. Morino indicated that [FH] is working on grade level in math and has scored well on math assessments. She indicated that [FH] has improved in her fluency in mathematic facts. The committee recommended possible intervention strategies to improve her fluency." (District Ex. 6, at 7.)

pointed to "the student's report card indicating she needs improvement in all areas of math fluency," (IHO Decision 35), the SRO pointed out that the same report card indicated that FH "continued to meet State learning standards in four areas of mathematics including 'computes accurately,' and she partially met State standards in the remaining area," (SRO Decision 19). Achievement of passing grades and regular advancement in a general education class, as FH demonstrated here, is evidence of a FAPE.  *See Cerra*, 427 F.3d at 196 ("[W]hen a learning-disabled child is in a mainstream class, the attainment of passing grades and regular advancement from grade to grade will generally constitute evidence of satisfactory progress.") (internal quotation marks omitted).

ii.  <u>Speech-Language Services</u>

The DPC states that "Speech Language services remained as just a consult once a week for 15 minutes," suggesting that Plaintiff desired more.  (DPC 2.)  The 2010 IEP actually eliminated speech-language consultation services.  The SRO relied on testimony of FH's fourth-grade speech language pathologist that FH had mastered the speech-related "Earobics" computer program over the fourth-grade year, and that she did not believe that FH would benefit from continued speech-language services.  (SRO Decision 20-21.)  Between this and testimony that FH's articulation did not affect her teachers' ability to understand her or her ability to participate in class or interact with classmates, the SRO reasonably concluded that speech language consultation services were not necessary given FH's level of need.  (*Id.*)  According due weight to the SRO's reasoned conclusion, I agree that speech-language consultation services were not required to provide FH with a FAPE.

iii.  <u>Extended School Year Services</u>

The DPC raises an issue with the removal of ESY services – namely, that the District had not shown absence of regression.  (DPC 2.)  The IHO found that the removal of ESY services

"was not based on an appropriate evaluation of the student's need for this service," citing the absence of a "specific determination" that, or "evaluation" of whether, substantial regression would not occur in the absence of ESY services.  (IHO Decision 36-37.)  The IHO also took issue with Mrs. Piaquadio's report on the issue, which he found used an "improper" and "plainly . . . erroneous standard."  (*Id.* at 37.)  The SRO disagreed, finding that Mrs. Piaquadio's observations of little or no regression after an 18-day winter recess and a 5-day snowstorm break, while using a standard that did not comport with State regulations, nevertheless supported the notion that FH would not experience substantial regression over the summer.  (SRO Decision 24.)  Furthermore, the SRO noted that none of the private consultants who examined FH indicated that substantial regression was likely to occur.  (*Id.* at 24-25.)

Plaintiff argues that the SRO impermissibly shifted the burden to the Plaintiff, because the SRO stated that "'the hearing record is bereft of evidence suggesting that the student required ESY services in order to prevent substantial regression.'"  (P's Mem. 13 (quoting SRO Decision 25).)  While it is true that the burden remains on the District to show that the student did not exhibit a need for ESY services "in order to prevent substantial regression," *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(k)(v), a negative can often be proven only by the absence of the evidence.  Where a thorough evaluation by numerous professionals who have considered the issue – including some privately retained by the parents – reveals no reasonable risk of substantial regression, a school district may meet its burden of showing the absence of a need for ESY services.  *See D. D-S. v. Southold Union Free Sch. Dist.*, No. 09-CV-5026, 2011 WL 3919040, at *16 (E.D.N.Y. Sept. 2, 2011) ("There being no evidence of substantial regression, the Court affirms the holding of the SRO that [the student] was ineligible for ESY."), *aff'd*, 2012 WL 6684585 (2d Cir. Dec. 26, 2012).

The record here contains indications that substantial regression was not likely, and Plaintiff identifies no evidence indicating that substantial regression was likely.  Thus, according due weight to the reasoned conclusion of the SRO, I do not find that ESY services were required.

### 3. Adequacy of Reading Services – Teaching Methodology and Teachers' Qualifications

Plaintiff makes no arguments and cites no case law to support the position that failing to provide the identity or qualifications of a student's teacher in advance of the school year is a procedural or substantive violation of the IDEIA.  Accordingly, this issue is deemed abandoned. *See J.L.*, 2013 WL 625064, at *14; *Engwiller*, 110 F. Supp. 2d at 249.

As to the adequacy of the reading program itself, the parents' concern appears to be that the District has not specified that it will use the proprietary Orton-Gillingham approach to teach FH.  Nevertheless, the IEP indicates that FH requires a "multi-sensory learning style," (District Ex. 6, at 8), which is of the type that Dr. Busby recommended for FH, (*see* District Ex. 5, at 9 (Dr. Busby recommending "specific remediation that includes a multi-sensory sequential systematic phonetic based instruction such as Orton-Gillingham instruction"); Busby Report 21 (recommending a "professional such as a reading specialist . . . preferably one trained in Orton-Gillingham methods")).  More fundamentally, the law does not require an IEP to adopt the particular recommendation of an expert; it only requires that that recommendation be considered in developing the IEP.  *See E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010) ("The mere fact that a separately hired expert has recommended different programming does nothing to change the deference to the district and its trained educators.") (alterations and internal quotation marks omitted); *Pascoe v. Washingtonville Cent. Sch. Dist.*, No. 96-CV-4926, 1998 WL 684583, at *6 (S.D.N.Y. Sept. 29, 1998) (finding IEP appropriate despite strong recommendations of outside educators to use Orton-Gillingham

methods at a private school specializing in educating dyslexic students); *cf. H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 09-CV-10563, 2012 WL 2708394, at *16 (S.D.N.Y. May 24, 2012) (rejecting specific recommendation of family's private audiologist is not a denial of FAPE if the "device employed is reasonably calculated to allow the child to receive educational benefits").[25]  And, indeed, the record reflects that Mrs. Piaquadio, FH's fourth-grade special education teacher, had some Orton-Gillingham training.  (*See, e.g.*, Parent Ex. GG (letter from principal to parents regarding, among other things, Mrs. Piaquadio's training).)  That it was not the extent of training for which the parents wished, or did not lead to official certification by the Academy of Orton-Gillingham, (*see* Tr. 503-04 (CH testifying that she followed up with the location where Mrs. Piaquadio had received training, and learned that she had completed only one of the three components apparently required for official associate level certification)), does not undermine the training itself or the fact that it comports to some extent with Dr. Busby's recommendation.  In short, while the teacher may not have had the qualifications the parents ideally would have wanted, the IDEIA does not require provision of what the parents think best, or even what is best; it merely requires what is good enough for the student to make reasonable progress.  *See M.H.*, 685 F.3d at 245; *Cerra*, 427 F.3d at 195.  The record clearly reveals that, notwithstanding the perceived shortcomings of the program or the teacher, FH was making such progress.

*       *       *

Ultimately, this appears to be a situation where loving parents want what is best for their child, and are, naturally, advocating strongly for it.  But because the IDEIA does not require

---

[25] Here, even the parents did not want to adopt all of Dr. Busby's recommendations.  Dr. Busby recommended a smaller classroom for FH, (Busby Report 21), but CH preferred that FH remain in a general education setting, (*see* Tr. 681-83; D's 56.1 ¶ 25).  To suggest that the District was obligated to adopt all of Dr. Busby's recommendations, while not doing so themselves, undermines the parents' position here.

schools to provide "everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (internal quotation marks omitted), but rather only a "basic floor of opportunity," *Rowley*, 458 U.S. at 201, I agree with the reasoned decision of the SRO that the alleged inadequacies of the 2010 IEP did not deprive FH of a FAPE.

## IV.   Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 11, 14), enter judgment for the Defendant, and close the case.

**SO ORDERED.**

Dated:  March 28, 2013
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

29